UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

In re

ALIANZA TRINITY DEVELOPMENT
GROUP, LLC,

    Debtor.
_____/

Case No.: 16-24483-BKC-AJC
Chapter 11 Proceeding

ALIANZA TRINITY DEVELOPMENT
GROUP, LLC,

    Plaintiff

v.

LANTERN BUSINESS CREDIT LLC,

    Defendant.
_____/

Adversary Case No. _____

## COMPLAINT TO SURCHARGE LANTERN BUSINESS CREDIT LLC'S COLLATERAL WITH THE ADMINISTRATIVE EXPENSES OF THE ESTATE

Alianza Trinity Development Group, LLC ("Debtor"), by and through undersigned counsel and pursuant to 11 U.S.C. §506(c), files this Complaint to surcharge Lantern Business Credit LLC's ("Lantern") collateral with the administrative expenses of the estate, entailing the expenses and attorney's fees incurred by the Debtor and the Official Committee of Unsecured Creditors ("Committee")[1] and, as grounds in support, the Debtor alleges as follows:

### JURISDICTION AND VENUE

1.    This is an adversary proceeding filed pursuant to 11 U.S.C. §506(c), to surcharge administrative expenses of the Debtor's estate, comprising expenses and attorney's fees incurred by the Debtor and Committee in connection with the Debtor's Chapter 11 bankruptcy proceeding

---

[1] The Debtor expects that the Committee will seek derivative standing to join in this Complaint and the Debtor has no objection to the Committee doing so.

**LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP**
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

currently pending in this Court under Case No. 16-24483-BKC-AJC (the "Chapter 11 Case"), against Lantern's collateral.

2. Lantern's collateral consists of substantially all of the Debtor's assets (the "Property").

3. This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §157(a) and 28 U.S.C. §1334.

4. This is a core proceeding under 28 U.S.C. §157(b) and venue is proper under 28 U.S.C. §1409.

## PARTIES

5. The Debtor filed a voluntary Chapter 11 bankruptcy petition in this Court on October 27, 2016 (the "Petition Date") and remains a debtor-in-possession.

6. Lantern is the Debtor's senior secured lender, which made loans to the Debtor prepetition and post-petition.

## FACTUAL ALLEGATIONS

### SUMMARY

7. Since the filing of this bankruptcy case 1 year ago, Lantern insisted on a prompt sale process for the sale of substantially all of the Debtor's Property, free and clear of liens under §363 of the Bankruptcy Code.

8. The Debtor was left with little choice but to agree to a sale process in exchange for Lantern providing interim debtor-in-possession financing, so that the receiver of the Debtor's non-debtor affiliate manager of the Property had funds to continue to operate it. Indeed, not a single dollar of the interim debtor-in-possession financing has been used by the Debtor directly or even funded to the Debtor's DIP Account.

9. Every step of the way, the Debtor cooperated with Lantern's sale milestones to facilitate a sale of the Property as demanded by Lantern and for its benefit.

10. Notwithstanding the guise of insisting on a well marketed sale, however, Lantern's true colors began to show as it progressively derailed the sale process in order to snatch up the Property without competition from bidders.

11. First, without disclosing the relationship, Lantern insisted that the Debtor retain the very broker that Lantern had joined forces with pre-petition in efforts to sell Lantern's note pertaining to the Property.

12. Second, Lantern refused to agree to a release price for the Property in order to provide certainty in the market to allow prospective bidders to prepare bids for the Property. To further sow confusion in the market place Lantern in writing and in open court stated a release price it would agree to and when the Debtor acquiesced Lantern *increased* its demand.

13. Third, after the Court had already denied Lantern the ability to credit bid, and notwithstanding Lantern's counsel's numerous promises on the record that it would fund a sale of the Property which sale it insisted upon, Lantern threatened to terminate DIP financing 1 week before the bid deadline unless a new condition was included in the 10tth interim DIP financing order contrary to the Court's denial of a credit bid by Lantern and contrary to the language in the 9 prior interim DIP financing orders. Namely, Lantern sought to include language giving it the right to credit bid on the Property, unless the Committee filed an adversary proceeding contesting its claim by the time of the sale.

14. Lantern's intention to destroy the sale process came to fruition when no bids were received by the Debtor by the bid deadline of October 9, 2017, hence, resulting in the cancelation of the auction.

15. Lantern's self-serving actions and bad faith conduct in the Chapter 11 Case caused the estate to incur substantial administrative expenses and, thus, those expenses are properly borne by Lantern by way of surcharge under §506(c).

16. The vast majority of those administrative expenses were incurred by Debtor's counsel and counsel for the Committee, which have been immersed in the many facets of the Chapter 11 Case toward the end of achieving the best and highest price for the Property.

17. From securing the Court's retention of a broker, uncovering the undisclosed connection between the Debtor's court retained broker and Lantern, enlisting a second broker to assist with marketing the Property in an attempt to sanitize a tainted sale process enabled by Lantern and analyzing bid and sale issues to participating in periodic conference calls led by the brokers to discuss marketing and prospective bidders, drafting comprehensive sale procedures motions, orders, notices and asset purchase agreements, opposing Lantern's motion to credit bid and insisting that Lantern provide a release price, the bulk of the costs and attorney's fees incurred by Debtor and the Committee were *caused by* Lantern's aggressive requirements for a sale on the one hand and its efforts on a parallel track to derail the sale.

18. Lantern also *consented to* having its collateral surcharged to the extent of $75,000.00 by way of a carve-out of its first lien on the Debtor's Property as reflected in all interim DIP financing orders entered by this Court to compensate fees and costs incurred by counsel for the Debtor and Committee.

19. Further, Lantern also consented to funding the sale process, which its counsel confirmed several times on the record in the Chapter 11 Case.

20. Separately and alternatively, Lantern was **benefitted by** the necessary and reasonable expenses and fees incurred by the estate as a result of Debtor's counsel and the Committee's counsel efforts to preserve and ready the Property for sale.

21. Specifically, the thoroughly vetted marketing campaign for the Property has provided Lantern with a clear road map as to potential purchasers for the Property outside of this bankruptcy case, even though Lantern manipulated the sale process along the way.

## SPECIFICS

22. Since the Petition Date, the Debtor has been operating as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

23. On December 2, 2016, the U.S. Trustee's Office filed a notice of appointment of the Committee [ECF No. 41].

As of the date of the filing of this Complaint, no request for the appointment of a trustee or examiner has been made.

24. The Debtor is a limited liability company organized and existing under the laws of the State of Florida and is engaged in business of owning and developing 1,690 acres of real estate in the mountains near Asheville, North Carolina, located at 2222 Palmer Road, Mill Spring, North Carolina 28756, consisting of home sites and a hotel site, condominiums, an equestrian center, golf club and restaurant that are used by homeowners on the site (the "Bright's Creek Development").

25. On Bankruptcy Schedule A, the Debtor lists a value for its real property of $34.3 million based on a pre-petition appraisal of the real property. *See* ECF No. 21 and 50 (amended Bankruptcy Schedule A).

26. On November 28, 2016, the Debtor filed an emergency motion for entry of interim and final orders authorizing post-petition financing [ECF No. 25] ('DIP Financing Motion" or "DIP Financing") secured by a priming lien and a super priority administrative expense claim in Lantern's favor. This was filed prior to the appointment of a Committee.

27. A non-negotiable condition to Lantern providing DIP Financing was the Debtor's agreement to comply with very tight milestones for the sale of its Property, the first of which required the Debtor to file an application to employ a broker to sell the Property eleven (11) days after the filing of the DIP Financing Motion (by December 9, 2016), with the auction of the Property occurring 2 ½ months later (by February 24, 2017). *See* the Credit Facility terms and conditions attached to the DIP Financing Motion as Exhibit "2" at pages 9 and 10.

28. The Debtor had no choice but to comply with Lantern's demands for an early auction of its Property, as the Debtor's non-debtor affiliate did not generate any revenue and was cash flow negative. Rather, the DIP Financing was to be paid by Lantern to a court appointed receiver of the Debtor and its non-debtor affiliate, Bright's Creek Golf Club ("BC"), which manages the operations on Bright's Creek Development.

29. Ultimately, with the assistance from the United State Trustee's Office and the Committee's counsel, who helped to mitigate many of the aggressive and unreasonable sale milestones required by Lantern in the Credit Facility and eliminate unfair stipulations and waivers therein as well, the Court entered an Interim Order authorizing DIP financing but only required that the broker be retained for the marketing and sale of the Property by December 9, 2016 [ECF No. 37] ("First Interim Order").

30. The First Interim Order and all subsequent interim DIP financing orders also contain: (1) a stipulation by the Debtor that Lantern is owed $12.2 million in principal and

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

accrued interest and pre-petition attorney's fees and expenses as of the Petition Date, but disputes the amount of Lantern's alleged prepayment fee and interest thereon (*see* ¶4(a)); and (2) a carve-out from Lantern's first lien on the Property up to $75,000.00 for attorney's fees and costs incurred by the Debtor and the Committee (*see* ¶1(b)).[2]

31. As required by Lantern's time table for employment of a broker to sell the Property, the Debtor filed an application to employ Ben Jenkins and Land Advisors Resort Solutions ("Land Advisors") as its broker to market and sell the Property on December 16, 2016 [ECF No. 55] (the "Application").

32. Land Advisors was Lantern's preferred broker, which Lantern's counsel vehemently expressed to Debtor's counsel and admitted on the record at a May 24, 2017 hearing: "We did suggest Mr. Jenkins, as a qualified party." *See* transcript at page 10, lines 1-2.[3]

33. As required, the Application included an Affidavit by Mr. Jenkins attesting to any connections that he or Land Advisors had to the Debtor, its creditors and the bankruptcy estate/case.

34. The Court approved the Application on December 22, 2016 [ECF No. 66].

35. At the time of the filing of the Application, the Debtor was unaware of any problems with the Affidavit, although it was later discovered that Lantern was aware of material omissions in the Affidavit, but chose to remain silent.

36. As a result of Rule 2004 discovery propounded by Committee counsel upon Lantern, Mr. Jenkins and Land Advisors, Committee counsel unearthed that Mr. Jenkins had a prior, undisclosed, relationship with Lantern in connection with the sale of the Property pre-

---

[2] Every interim order after the Committee was constituted contains an explicit unqualified reservation of the Committee's right to object to the DIP Loan and any claim filed by Lantern.

[3] Copies of all transcripts referenced in this Complaint are attached hereto as **Composite Exhibit "A."**

petition, which the Committee contended in its filings compromised the sale of the Property in this case.[4]

37.    Ultimately, the Debtor was required to seek retention of a second co-broker, Michael Fay of Avison Young, to assist Mr. Jenkins with marketing the sale of the Property in an attempt to sanitize a tainted sale process enabled by Lantern.

38.    Mr. Fay and Avison Young's retention as co-broker was approved by the Court on July 24, 2017 [ECF No. 273].

39.    In accordance with the sale process and time table agreed to by the parties, the Debtor filed a motion to approve sale procedures and identification of a stalking horse bidder in early February 2017 [ECF No. 89] (the "Sale Procedures Motion").

40.    The Sales Procedure Motion sought approval of a sale process, including the identification of a stalking horse bidder by the end of March 2017, with a subsequent motion to be filed by the Debtor by early April 2017 seeking to establish bidding procedures, approve a stalking horse bidder and bid protections, establish procedures relating to the assumption and assignment of executory contracts and unexpired leases, approve the form and manner of the sale, cure and other notices, schedule an auction and a hearing to approve the sale of the Property to the successful bidder and approve the sale of the Property free and clear of liens (the "Sale Motion"). *See* Sale Procedures Motion at pages 4-6.

41.    On March 3, 2017, the Court entered an Order granting the Sale Procedures Motion in part which required, among other things, that a stalking horse bidder be identified by March 30, 2017 and the Debtor file the Sale Motion by April 3, 2017, with an auction to occur on April 26, 2017 [ECF No. 138].

---

[4]The Debtor reserves all rights to assert claims against Mr. Jenkins, Land Advisors and Lantern pertaining to these matters.

42. The Court's Order dated March 3, 2017 also addressed an objection to the Sale Procedure Motion filed by the Committee pertaining to Lantern's right to credit bid at the auction of the Property, requiring that, short of a stipulation, Lantern had to file a motion to determine the maximum amount of its credit bid before the auction.

43. Ultimately, no stalking horse bidder was identified by March 30, 2017, Committee counsel filed a motion under seal [ECF No. 172] seeking a delay of the sale process in light of Rule 2004 discovery the Committee received from Lantern disclosing its prior relationship with Mr. Jenkins, Lantern filed a motion seeking authority to credit bid which the Committee objected to, and the Court denied Lantern's motion to credit bid after a hearing upon notice [ECF No. 235].

44. Prior to the Court denying Lantern's motion to credit bid, Lantern's counsel represented on the record that Lantern would agree to cap its credit bid at $13 million.

45. Specifically, at a hearing on May 24, 2017, Lantern's counsel stated: "We filed a $14 million proof of claim. We have about a million dollars in DIP financing roughly, so roughly $15 million. We offered to the broker to cap our credit bid amount at $13 million dollars….We're essentially discounting the debt by $3 million dollars, or $2 million." *See* transcript at page 11, lines 7-11 and page 25, lines 10-12.

46. At a hearing on July 19, 2017, Lantern's counsel reminded the Court: "…[j]ust to clear up the record, the $13 million offer before was an offer to cap the credit bid at that amount, meaning if there was an offer in excess of $13 million, we were willing to allow it to be sold free and clear of the lien complaint." *See* transcript at page 20, lines 11-16.

47. On June 27, 2017, the Debtor filed the Sale Motion [ECF No. 238] which, among other relief, sought approval of a minimum opening bid for the Property of $8 million. Lantern

LEVINE KELLOGG LEHMAN SCHNEIDER + GROSSMAN LLP
201 South Biscayne Boulevard, 22nd Floor, Citigroup Center, Miami, Florida 33131 · Main: 305.403.8788 · Fax: 305.403.8789

filed an objection to the Sale Motion [ECF No. 266] ("Sale Objection"), stating that although it filed a proof of claim in the amount of $14,161,665.84, the Court should set the minimum bid at $13.3 million.

48.     At the July 19, 2017 hearing on the Sale Motion, Lantern's counsel further reduced the minimum bid required by Lantern to $13 million: "I think at a minimum we should have a floor of $12 million, $13 million which accounts for the $12 million pre-petition, and in excess of a million dollars post-petition.....[5] Setting the minimum bid amount at $13 million, which is an amount we were willing to cap our credit bid at, really resolves the issue." *See* transcript at page 11, lines 24-25, page 12, lines 1-2 and page 24, lines 1-3.

49.     In response to the Court's concern as to how a sale would proceed in the face of uncertainty over the extent of Lantern's allowed secured claim for purposes of establishing a release price for the Property, Lantern's counsel stated: "It seems to me, Your Honor, that that could be adjudicated…very quickly." *See* transcript at page 24, lines 15-18.

50.     On July 25, 2017, the Court entered an Order approving the Sale Motion, including the $8 million opening bid amount, but stated that it would not approve a sale of the Property for less than the amount of Lantern's allowed secured claim. [ECF No. 272].

51.     Rather than keeping its word and confirming the $13 million release price for the Property that its counsel committed to at the hearing on the Sale Motion (or the $13.3 million release price that Lantern's counsel committed to in Lantern's Sale Objection) so as to give prospective bidders a definitive gauge for purposes of preparing their bids, Lantern filed a motion for the entry of an order either allowing its pre-petition claim for $14.1 million before

---

[5]Query then, as to why Lantern's proofs of claim filed in this case assert that $14.1 million is owed when Lantern's counsel articulated that the pre-petition debt is $12 million, which amount the Debtor has stipulated to in interim DIP financing orders entered by this Court.

fees, costs and interest or, alternatively, granting it leave to amend its proof of claim [ECF No. 281] (the "Claim Motion").

52. In the Claim Motion at page 2, ¶2, Lantern acknowledged that:

> Resolving the status of Lantern's claim would eliminate uncertainty for potential bidders as to the amount of a minimum bid, and Lantern believes this would incentivize interested parties to actually bid. If the uncertainty is not resolved, interested parties very well may conclude that it would be a waste of their time and resources to undertake due diligence on the Property and participate in the sales process when they have no idea how much Lantern's secured claim actually is.

53. At the August 16, 2017 hearing on the Claim Motion, Lantern further admitted to the confusion in the market place caused by the undetermined secured claim asserted by Lantern: "...bidders are asking, 'what is the release price; what amount are we going to have to bid in order to get this property?' ... Because of that, I think we need, and other parties agree we need, to resolve this in advance of the auction....How are parties supposed to know what to bid if we don't have resolution?... Pretty simply, what we're looking to do is provide clarity to the sale process.... Obviously my client would like to have their claim allowed in the full amount. But at a minimum, I believe that the $13.9 million, roughly, of undisputed ... pre-petition debt and DIP funding, would be the appropriate release price." *See* transcript at page 7, lines 2-8, page 10, lines 10-12 and page 12, lines 2-4.

54. The Debtor's response to the Claim Motion and presentation at the hearing on the Claim Motion highlighted the hypocrisy behind Lantern's alleged desire to bring clarity to the market for bidders to prepare bids, as Lantern purposely kept moving the goal post.

55. Lantern first stated on the record that $13.3 million was an acceptable release price (in its filed objection to the Sale Motion), lowered it to $13 million (at the hearing on the

Sale Motion), raised it back to $14.1 million (in the Claim Motion) and finally reduced it to $13.9 million (at the hearing on the Claim Motion).

56.     Ultimately, the Court denied Lantern's motion to allow its pre-petition claim, however, granted it leave to file an amended claim and its amended claim alleges that $14.1 million is owed.

57.     A couple of weeks later, Lantern decided to change horses. When circulating a proposed 10th interim DIP order in an effort to obtain agreement in advance of the August 31, 2017 hearing to consider additional interim DIP financing, undersigned counsel asked for comments from counsel for Lantern and the Committee. In response, counsel for Lantern since the beginning of this case, Brent McIlwain from Holland & Knight, advised that Lantern had hired new counsel at DLA Piper and that they would respond to the proposed order.

58.     The next day, new counsel for Lantern responded by threatening to terminate DIP funding 1 week before the bid deadline and 2 weeks before the scheduled auction (notwithstanding Mr. McIlwain's unequivocal representations on the record throughout the case that Lantern would fund a sale of the Property, which sale Lantern insisted upon), unless a new condition was inserted into the 10th interim DIP financing order.

59.     That new condition was contrary to the Court's ruling denying credit bidding by Lantern and contrary to the form of the prior 9 interim DIP financing orders. Namely, Lantern sought to include language giving it the right to credit bid on the Property, unless the Committee filed an adversary proceeding contesting its claim by the time of the sale.

60.     At the August 31, 2017 hearing, counsel for the Debtor and Committee argued that this latest tactic confirmed prior suspicions that Lantern was proceeding in bad faith

regarding DIP financing and they sought to include language in the 10th interim DIP financing order that disputed Lantern's good faith under §364(e).

61. In response, Lantern's new counsel reiterated Lantern's promises made numerous times on the record to fund a sale of the Property, but with a self-serving twist this time: "…Lantern has on numerous occasions emphasized its willingness to continue funding for the purpose of the sale. However, we're not willing to do it if…the debtor will not agree to the changes regarding good faith." *See* transcript at page 22, lines 2-6.

62. After two unopposed extensions of time granted by the Court, the deadline for submission of bids was October 9, 2017 and an auction was scheduled for October 16, 2017.

63. All the while Lantern refused to commit to a release price as it had promised to do in order to clear up confusion in the market as to the release price.

64. The uncertainty amongst potential bidders was manifested when no bids were received by the Debtor by the bid deadline of October 9, 2017.

65. Lantern's actions and conduct in the Chapter 11 Case ***caused*** the Debtor and Committee to incur administrative expenses, which are summarized and attached hereto as **Exhibit "B."** [6]

## COUNT I: SURCHARGE UNDER §506(c)

66. Debtor realleges and reincorporates paragraphs 1 through 65 above as if fully set forth herein.

67. To surcharge a secured creditor's collateral, a trustee or debtor-in-possession must show that the secured creditor expressly or impliedly consented to the expense or, absent such consent that (i) the expenditure was necessary, (ii) the amount expended was reasonable, and (iii)

---

[6] Copies of the invoices supporting the summaries in **Exhibit "B"** are voluminous and therefore are not attached to this Complaint, however copies of the invoices will be made available to Lantern by counsel for the Debtor and counsel for the Committee if necessary after redaction for any privileged communications.

the secured creditor benefitted from the expenditure. *In re: The Spa At Sunset Isles Condominium Association, Inc.*, 454 B.R. 898, 908 (Bankr. S.D. Fla. 2011 (J. Hyman). Implied consent, as distinguished from actual consent, is typically limited to cases where the creditor has caused the additional expense in some manner. *GECC v. Peltz, et al. (In re: Flagstaff Foodservice Corp., et al.)*, 762 F.2d 10, 12 (2nd Cir. 1985).

68. The ability to surcharge a secured creditor's collateral emanates from §506(c):

> The trustee may recover from property securing an allowed secured claim The reasonable, necessary costs and expenses of preserving or disposing of, such property to the extent of any benefit to the holder of such claim, including the payment of all ad valorem property taxes with respect to the property.

69. While the Bankruptcy Code emphasizes the element of "benefit to the secured creditor," cases interpreting §506(c) continue to consider whether the creditor in any way consented to or caused the expenditures which the trustee or debtor-in-possession seek to recover. *In the Matter of By The Sea Foods, Inc.*, 30 B.R. 262, 265 (Bankr. M.D. Fla. 1983). Accordingly, as an alternative to the statutory language contained in §506(c), surcharge is proper if the claimant establishes that the secured party directly or impliedly consented to or caused the expense. *Daniel v. Amci (In re: Ferncrest Court Partners, Ltd.)*, 66 F.3d 778, 782 (6th Cir. 1995). A court may imply consent by a secured party from the circumstances of the case. *Id.*

70. In this case, a surcharge against Lantern's collateral is appropriate based on Lantern causing and consenting to administrative expenses of the estate in connection with a sale of the Property. Alternatively, surcharge is proper based a direct benefit to Lantern resulting from necessary and reasonable expenses to preserve and ready the Property for sale.

### Lantern *Caused* the Administrative Expenses

71.     Lantern's collateral should be surcharged with the attorney's fees and costs incurred by the Debtor and Committee in this case as reflected on **Exhibit "B"** because Lantern:

(a) *Caused* the Debtor to pursue a sale of the Property as a condition to DIP financing;

(b) *Caused* the Debtor to hire Mr. Jenkins of Land Advisors to market the Property, even though Lantern knew but failed to disclose to the parties and to the Court that it had a prior relationship with Mr. Jenkins entailing Mr. Jenkins' efforts to sell Lantern's note for the Property prepetition;

(c) *Caused* the discovery and litigation that ensued by the Committee when Lantern remained silent regarding its pre-petition relationship with Mr. Jenkins and Land Advisors;

(d) *Caused* the Debtor to seek retention of co-broker Mr. Faye from Avison Young to market the sale of the Property with Mr. Jenkins in efforts to sanitize what the Committee declared as a tainted sale process;

(e) *Caused* the drafting of substantive motions, asset purchase agreements, orders and notices pertaining to the sale and attendance by counsel at all hearings pertaining to same;

(f) *Caused* confusion in the market when Lantern refused to commit to a release price for the sale of the Property, which precluded potential bidders from submitting bids; and

(g) *Caused* the cancelation of the auction when no bids were received by the Debtor and, hence, the failure of the sale process.

### Lantern *Consented* to the Administrative Expenses

72.   Lantern's collateral should be surcharged with the attorney's fees and costs incurred by the Debtor and Committee in this case as reflected on **Exhibit "B"** because Lantern:

>   (a)   ***Consented*** to a carve-out of its first lien on the Debtor's Property up to $75,000.00 to pay the Debtor's and Committee's professionals' attorney's fees and expenses; and

>   (b)   ***Consented to funding the costs associated with the sale of the Property, including paying*** the co-brokers' initial fees and commissions, as reflected numerous times by its counsel on the record in this case.

### Lantern was *Benefitted* by the Necessary and Reasonable Expenses to Preserve and Ready the Property for Sale

73.   As an alternative basis for surcharge, the necessary and reasonable expenses incurred by the Debtor and the Committee in this case to preserve and ready the Property for sale as set forth on **Exhibit "B,"** which sale Lantern insisted upon, directly benefitted Lantern.

74.   As a result of Lantern's adamancy that the Property be sold on the one hand and notwithstanding Lantern's bad faith conduct to derail the sale so that there would be no bidders and it could seize the Property on the other hand, a fully vetted marketing of the Property for sale transpired.

75.   Lantern was directly benefitted by the sales process because the market is keenly aware of Lantern's first lien position in the Property for purposes of contacting Lantern to submit offers for purchase of the Property and Lantern is fully aware of prospective bidders to contact as potential purchasers of the Property.

76.   As evidenced by **Exhibit "B,"** the legal services rendered by Levine Kellogg Lehman Schneider + Grossman LLP ("LKLSG") as counsel for the Debtor and by Berger

Singerman LLP ("Berger Singerman") as counsel for the Committee were necessary in order to comply with Lantern's mandate for a sale of the Property and were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the issues and tasks addressed.

77. LKLSG and Berger Singerman enjoy good reputations for their abilities in the areas of bankruptcy, creditor's rights, and complex commercial litigation in the South Florida legal community, and LKLSG's and Berger Singerman's billing rates reflect customary billing rates in the South Florida legal community for legal services similar to the services rendered by LKLSG to the Debtor and by Berger Singerman to the Committee in this case.

**WHEREFORE**, the Debtor respectfully request that this Court enter a judgment surcharging Lantern's collateral in an amount no less than $692,086.61 for payment to the estate, comprising the expenses and attorney's fees incurred by the Debtor and Committee in connection with the Chapter 11 Case and for such other and further relief as the Court deems just and proper.

October 30, 2017.

Respectfully submitted,

LEVINE KELLOGG LEHMAN
SCHNEIDER + GROSSMAN LLP
Attorneys for Debtor
201 South Biscayne Blvd.
Citigroup Center – 22nd Floor
Miami, Florida 33131-4301
Telephone: 305.403.8788
Facsimile: 305.403.8789

By: **/s/ Thomas R. Lehman**
Thomas R. Lehman, P.A.
Florida Bar. No. 351318
E-mail: trl@LKLlaw.com
Robin J. Rubens, Esq.
Florida Bar No. 959413
E-mail: rjr@lklsg.com